FILED
JUN 16 2008
U.S. COURT OF FEDERAL CLAIMS

ORIGINAL

# In The United States Court Of Federal Claims

| | | |
|---|---|---|
| TETRA TECH EC, INC. | § | |
| Plaintiff | § | |
| | § | No. 08-434 C |
| v. | § | |
| | § | |
| THE UNITED STATES | § | |
| | § | |
| Defendant | § | |

## COMPLAINT

Tetra Tech EC, Inc., ("TtEC") files this Complaint against the United States as follows:

## JURISDICTION

1. This Court has jurisdiction pursuant to 28 U.S.C. §1491(a) and 41 U.S.C. §609(a).

2. This Court has jurisdiction to render judgment upon any claim against the United States founded upon any express or implied contract with the United States. *See* 28 U.S.C. §1491(a). An express or implied contract with the Army is considered an express or implied contract with the United States. *Id.*

3. TtEC brings this action directly on a claim against the Army following a failure by the contracting officer to issue a final decision on a contract claim within the period required and/or an adverse but defective decision that failed to meet the formal requisites of 48 C.F.R. §33.211, which is a claim within the jurisdiction of this Court. *See* 41 U.S.C. §§605, 609. In lieu of appealing the decision of a contracting officer to an

agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary. *See* U.S.C. §609(a).

**FACTUAL BACKGROUND**

4. The Rocky Mountain Arsenal Program Management Contract ("Contract"), Contract/Order No. DAAM02-97-D-0012, involved transforming an inactive Army installation, *i.e.,* the Rocky Mountain Arsenal, in Colorado into a National Wildlife Refuge (the "Project"). Remediation of the Rocky Mountain Arsenal, a former chemical weapons manufacturing site, is the Department of Defense's most technically complex environmental restoration and management project undertaken to date under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). More than 370 consent-decree task orders have been assigned to complete remediation and transform this 27-square-mile arsenal into an urban wildlife refuge managed by the U.S. Fish and Wildlife Service. The Department of the Army ("Army") initially contracted with Foster Wheeler Environmental Corporation ("FWENC") on or about May 23, 1997, to perform program management, which effectively made it a contract administrator and/or general contractor or prime contractor for the entire Project. Later, the Contract was transferred from FWENC to Tetra Tech FW, Inc. On April 21, 2005 the Contracting Officer issued Modification P00011, changing the name of the prime contractor from Tetra Tech FW, Incorporated to Tetra Tech EC, Incorporated (TtEC).

5. The claim asserted herein involves TtEC's right to recover attorney fees incurred during the course of performing the Contract. After disallowing a

subcontractor's claims for extra payment in an amount in excess of $15M (a duty imposed on TtEC by the Contract), TtEC was sued by the disgruntled subcontractor, URS Group, Inc. ("URS"). As a result of TtEC's successful defense against the claims asserted in the lawsuit, URS's recovery was limited to only about 3% of its total claim, (although this is now the subject of an appeal). In the course of carrying out its Contract duties to disallow improper claims, however, TtEC incurred attorney fees for which it is entitled to reimbursement under the Contract, but which the Army has failed and refused to pay.

### *A. Administration of the URS Subcontract was within the scope of TtEC's Contract with the Army.*

6. The Contract imposed management responsibilities that TtEC was obligated to perform, which included construction management and management of subcontracted activities. The Statement of Work ("SOW"), listed "Contractor Responsibilities" as follows:

> 1.1.1 The major SOW activities of the Contractor [TtEC] shall include … procurement of subcontractors for construction, demolition, and remediation efforts and oversight and management of subcontracted activities…
>
> 1.1.2 …the Contractor…shall commence administrative management activities…
>
> 1.1.3 The Contractor shall be responsible for the management and integration of the remediation activities…

Selection, oversight, and management of the subcontractors working on the Project were contractual duties stated in the Contract as part of TtEC's scope of work.

7. Procuring subcontractors to perform the work necessary to complete the Project, and subsequent management of the work performed by the subcontractors, fell within TtEC's management responsibilities under the Contract. The Request for Proposal ("RFP") that formed the basis of the subcontract with URS was part of the scope of work that TtEC undertook to supervise under its Contract with the Army. Subsequent management of the URS subcontract was part of the contractual duties assumed by TtEC under the Contract.

8. TtEC's administrative management of the URS subcontract included approval or disapproval of URS's change order requests or Contract Change Notices ("CCNs"), which ultimately resulted in URS filing a lawsuit against TtEC.

***1. The Subcontracting Implementation Plan is part of the Contract.***

9. The Contract included specific provisions pertaining to how the subcontracts were to be managed. The Subcontracting Implementation Plan, which became part of the Contract, imposed specific duties on TtEC to review and approve the applications for payment made by subcontractors. TtEC's investigation of URS's claims, its disallowance of improper or inflated claims, and its defense against such claims during litigation, were a part of its contractual duties. Moreover, the existence of URS's unresolved claims became part of the budget process of TtEC's own Contract once it became apparent that litigation was likely.

10. Ongoing dialogue between TtEC and the Contracting Officer, in accordance with express terms of the Contract, resulted in the participation of the Army in decisions made by TtEC to disallow the disputed CCNs submitted by URS. TtEC

provided continuous communication with the Army, including updated cost estimates, as URS's CCNs were received, reviewed, and disapproved. The decisions of TtEC in disallowing the CCNs were made with the full knowledge and tacit approval of the Army's Contracting Officer.

### 2. *URS's claims against TtEC were claims based upon TtEC's performance of its contractual obligation under Contract with the Army.*

11. The subject matter of the URS lawsuit was TtEC's failure to approve for payment certain improper CCNs submitted by URS. TtEC's rejection of certain CCNs submitted by URS due to URS's failure to comply with Contract provisions and/or due to excessive amounts claimed in the CCNs constituted performance of its Contract with the Army. Cost effectiveness in management of the URS subcontract was part of TtEC's responsibilities as contract administrator under the Contract. Refusing to approve improper or excessive change order requests was a contractual obligation that constituted performance under the Contract.

12. TtEC's steadfast refusal to approve URS's unjustified change orders eventually caused it to become a defendant in the lawsuit filed by URS in the District Court of Jefferson County, Colorado, and to incur additional but unavoidable performance costs. As such, all costs incurred by TtEC in defending against improper claims made by a subcontractor like URS, even litigation costs, were costs incurred in the performance of TtEC's Contract with the Army.

## B. *TtEC's costs of defense against URS's claims were costs included in its Contract.*

13. URS's lawsuit against TtEC was filed on October 26, 2004. The costs of defense against URS's claims incurred by TtEC before, during, and after URS filed its lawsuit (including costs being incurred during URS's appeal), were costs of performance that fell within the scope of work set forth in its Contract. TtEC is, accordingly, entitled to compensation for this work in accordance with the same Contract provisions applicable to other work performed under the Contract.

14. The Contracting Officer was provided with cost data on a timely basis – and a continuing basis, which showed the costs that TtEC was incurring in defending against URS's claims. The costs incurred by TtEC, as the dispute with URS over its CCNs grew and eventually escalated into litigation, were direct costs of contract performance and administration. These costs were documented and tendered to the Army for payment in accordance with Contract provisions.

15. The Contract specifically identified outside consultants as a direct charge to the Contract. In its Cost Accounting Standards Board Disclosure Statement ("CASB Disclosure Statement"), TtEC listed "consultants" as "Other Direct Costs (Items not included in Other Direct Cost Rate). In the Best and Final Offer ("BAFO"), Volume 4, Revised Cost and Pricing (incorporated into the Contract as Modification No. P00001), after calculating an hourly ODC ("Other Direct Costs") rate, the BAFO expressly provided in Paragraph A-6:

> In accordance with the intent of the solicitation, any other types of direct costs [not specifically included in the ODC rate] will be priced on an as needed basis for specific project requirements.

*See* BAFO, ¶A-6, page IV-16.

16. During the course of the URS litigation and the subsequent appeal, TtEC continued performance of its contractual duties by providing continuing cost data, cost estimates, and updates concerning the litigation to the Army Contracting Officer. The Army responded to TtEC's submission of its contract administration costs of the URS's claims, which included cost of defense in actual litigation of the claims, by issuing a series of four task orders: (1) Task Order 138 (URS scope of work); (2) Task Order 251 (URS litigation); (3) Task Order 298 (URS appeal); and (4) Task Order 376 (appeal to the Colorado Supreme Court)..

***1. Task Order 138***

17. On November 22, 2004, TtEC submitted a litigation cost estimate to the Army's Contracting Officer prepared by TtEC's outside counsel. The letter forwarding the estimate stated that a charge number would be established under the task order to track URS associated litigation support. With the realization that litigation costs were going to be incurred, a new task order was set up to track litigation expenses – Task Order 251 – while non-litigation costs continued to be allocated to Task Order 138.

18. A handwritten note from the Army Contracting Officer, dated November 22, 2004, acknowledged receipt of the litigation estimate, but stated as follows: "Recognize that you have established a charge code, but you cannot bill until this issue is resolved and legal costs are considered. Just because your legal costs are real doesn't mean they are allowable or considered fair and reasonable." The next day, November 23, 2004, the Army Contracting Officer advised that TtEC's litigation costs incurred would be reviewed for reasonableness and allowability "after the subject proceeding is

completed and then (and only then) be considered for billing." This Task Order has not been closed out, and actual unpaid costs incurred were $12,520.72.

2. ***Task Order 251***

19. TtEC included two types of costs that were charged to Task Order 251: (1) the fees of outside counsel incurred in defending the URS lawsuit; and (2) the use of TtEC staff to support the litigation activities whenever possible to reduce litigation expenses. The latter efforts resulted in significant savings to the Army. Task Order 251 was funded to some degree by the Army, but did not include sufficient funds to pay TtEC's outside counsel engaged in the defense against URS claims.

20. In an email dated March 11, 2005, the Contracting Officer advised: "I don't have a problem with your identifying the estimated litigation budget within the task order. However, I will not recognize this cost in the task order, nor will I provide any funding until this issue is resolved and a court decision is made." Implicit in the repeated statements that TtEC received from the Contracting Officer during this period was an understanding, derived from both a prior course of dealing between the parties and from ongoing correspondence, that its litigation expenses would be paid if the issue with URS was resolved with a favorable court decision. However, the duty of the Army to reimburse for costs allocable and allowable under the Contract was not conditional upon a court decision, whether favorable or unfavorable.

21. Settlement negotiations with URS continued over a period of time with the full knowledge of, and consultation with, the Army. At all times relevant herein, the Army controlled TtEC's ability to reach a settlement with URS, as any settlement was

subject to approval by the Army. The defined parameters of settlement authority authorized by the Army were insufficient to end the litigation, even after a formal mediation, which left TtEC no alternative but to continue to defend against the URS claims and incur the costs for which reimbursement is sought.

22. On January 11, 2006, the Army Contracting Officer proposed a meeting to discuss Task Order 251 funding, stating "I want to make sure that it is still understood that no further funding will be obligated on this task pending outcome of the litigation."

23. Funding actions were taken at various times by the Army Contracting Officers to provide additional funding of Task Order 251 and to extend its performance period. However, notwithstanding the continuing updates of its litigation budget provided by TtEC to reflect the litigation expenses incurred in its defense against URS claims, no funding was provided to pay the fees of TtEC's outside defense counsel.

24. Although TtEC was advised by the Army Contracting Officer that its litigation expenses would not be paid until after the conclusion of the litigation, at no time throughout the course of the litigation did any Army Contracting Officer opine that the litigation costs being incurred were not allocable, allowable, or reasonable.

25. On August 7, 2006, after the Final Order and Entry of Judgment was received, TtEC submitted its request for reimbursement of legal costs associated with its defense against the URS lawsuit. TtEC sought reimbursement of $1,892,060.28 for legal services incurred as a result of its performance of its duties as contract administrator in defending against URS claims. The costs were incurred from July 1, 2004, through July 17, 2006, and excluded costs associated with the appellate process.

26. The request for reimbursement complied with all formal prerequisites and requirements set forth in Contract documents and federal regulations. A detailed summary was provided to support the allocability, allowability, and reasonableness of the costs incurred. The request for reimbursement reflected actual costs and conformed with the requirements of FAR 15.403-5(b)(1) and Table 15-2. When two additional invoices were received from its outside counsel, a revised request for reimbursement was submitted to the Army Contracting Officer on August 21, 2006, seeking reimbursement in the amount of $2,005,885.50. An updated Certificate of Current Cost or Pricing was attached.

27. On March 27, 2007, TtEC submitted additional information that was requested by the Army Contracting Officer in support of its request for reimbursement of its legal costs in defense against URS claims. The information was divided into three parts: (1) a summary of the request for legal reimbursement; (2) a final contract accounting summary; and (3) a timeline for litigation defense. At the time of the submission, however, the appeals process had not concluded.

### *3. Task Order 298*

28. The final judgment of the trial court did not end the litigation, as URS elected to file an appeal. Task Order 298 was submitted to the Army Contracting Officer on July 18, 2006, to request funds for defending against URS's claims in the appeals process. The Task Order proposal included an estimate by outside counsel of costs expected to be incurred in opposing the URS appeal.

29. On May 1, 2007, a rate increase in the hourly rate charged by TtEC's outside counsel resulted in a revised estimate of litigation expenses being provided to the Army Contracting Officer. A follow-up letter to the Contracting Officer, dated May 18, 2007, stated that TtEC had determined that the adjusted rates were reasonable and reflected a discount from the market rates. The effect of the increase in the hourly rate on the previously submitted litigation budget for the appeals process was minimal.

30. A new estimate for URS litigation costs incurred during the appeal process was submitted to the Contracting Officer on June 8, 2007. On February 7, 2008, the Colorado Court of Appeals issued a ruling in which it affirmed the trial court judgment in part, reversed in part, and remanded the above referenced case for further proceedings in accordance with its ruling that the trial court had erred in finding that URS assumed the risk of the subsurface conditions by entering into a lump sum contract.

31. On July 2, 2007, TtEC submitted its amended certification of claim for the recovery of its litigation and appeal costs to the Army Contracting Officer. This was a complete billing of all of its unpaid litigation costs and appellate costs incurred at that point in time in defense of allegations made by URS in the underlying litigation. The total costs incurred by TtEC and invoiced to the Army under the Contract at the time were $2,163,953.45. TtEC included the certification required by FAR 33.207 and 52.233-1 that the claim was made in good faith, that the supporting data was accurate and complete to the best of its knowledge and belief, and that the amount requested accurately reflected a contract adjustment for which TtEC believed the United States was liable.

### 4. *Task Order 376*

32. On April 23, 2008, a petition for writ of certiorari to the Colorado Supreme Court was filed by TtEC, and a copy was provided to the Contracting Officer. An estimated forecast schedule of the costs of this petition for writ was previously provided to the Contracting Officer on March 11, 2008, which amounted to $265,000.00. This stage of the URS litigation remains ongoing.

### 5. ***TtEC complied with all regulatory and contractual requirements in submitting its request for reimbursement of legal costs incurred in performing its contractual duties.***

33. In accounting for the legal costs related to the URS litigation, TtEC consistently followed its audited and approved CASB Disclosure Statement, which set forth its cost accounting practices. TtEC's CASB Disclosure Statement identified the costs of "consultants" as a direct project cost, which was an item not included in the Project ODC rate. In accordance with both regulatory and contractual requirements, TtEC's attorney fees were direct costs not included in the ODC rate and were billed separately.

34. Because of the unreasonable delay by the Army in payment of its request for reimbursement of its legal costs, TtEC took additional affirmative action after the delay to convert its initial requests into a claim under the Contract Disputes Act ("CDA"). TtEC's request for reimbursement, submitted in full compliance with all Contract provisions, was not acted upon in a reasonable time. After waiting for a response for months, the request for payment was converted to a claim under the CDA by complying with the submission and certification requirements of the Act.

***C. The rationale for disallowing TtEC's entitlement to reimbursement of legal expenses is not supported by underlying facts.***

35. On July 11, 2007, TtEC received a response from the Army Contracting Officer to TtEC's request for reimbursement of legal expenses incurred under Task Orders 138, 251, and 298 that rejected TtEC's request for reimbursement of legal expenses. The stated basis for the Army's position rested upon two rationales: (1) the Federal Acquisition Regulations ("FAR") purportedly did not support the payment of litigation expenses by a prime contractor "to its subcontractor" as an allowable and allocable expense when the Government was not a party to the contract and did not pre-approve expenses associated with the dispute, litigation, etc.; and (2) no negligence on the part of the Government was found in the solicitation, selection, or execution of the contract in the holding of the trial judge. The Army's position was that legal costs incurred by TtEC in defending against disallowed claims made by URS was neither allocable nor allowable under the Contract.

36. The position taken by the Army is a direct breach of the parties' Contract and reflects a failure to understand the underlying facts of the URS litigation. Specifically:

(1) The Contract that supported TtEC's right to be reimbursed for its costs in defending against the URS claims was its Contract with the Army, not its subcontract with URS. The Subcontracting Implementation Plan, expressly incorporated into the Contract, imposed contractual duties on TtEC to manage subcontractor claims and defend against improper subcontractor claims. The subject matter of the URS litigation were the

CCNs that TtEC disallowed in the course of performing duties as contract administrator, and TtEC's contractual obligation to defend against disallowed claims of subcontractors was expressly set forth in Contract documents. The litigation expenses at issue were direct costs incurred by TtEC in performance of its contractual duties under its own Contract with the Army.

(2) Some portion of TtEC's defense costs incurred in defending against URS's claims had in fact been approved, authorized, and paid by the Army. These were costs incurred in litigation support, rather than fees paid to outside counsel, but the fact that the Army had in fact approved funding for some litigation costs incurred by TtEC in defense against URS's claims cannot be disputed. The Army's decision to pay some but not all of the litigation costs incurred by TtEC was arbitrary, capricious, and unreasonable.

(3) A course of dealing between TtEC and the Army had already been established that made reimbursement of attorney fees in defending against subcontractor claims an allocable and allowable cost under the Contract. The Contracting Officer had previously authorized reimbursement of TtEC's incurred litigation costs with respect to other legal proceedings arising from the Contract. Approval of these costs had included reimbursement of attorneys' fees. TtEC relied upon its prior course of dealing with the Army when incurring the costs of defending against the URS lawsuit with the full expectation of reimbursement.

(4) Characterizing the URS litigation as a lawsuit that resulted in payment "to a subcontractor" showed a complete misunderstanding of the lawsuit. The litigation and its outcome concerned TtEC's successful defense against approximately $15 million in claims that it had disallowed in diligently performing its duties as contract administrator. Notwithstanding the fact that a few of URS's CCNs were held to be payable, the judgment was a clear win for both TtEC and the Army, and it was the Army, not TtEC, that was the primary beneficiary of what was clearly a judgment in favor of the defense.

(5) The judgment did not find wrongdoing or liability on the part of the Government, but such a finding is irrelevant and unnecessary to TtEC's right to seek reimbursement for its costs incurred in performing its Contract with the Army. The judgment was in reality a vindication of all of the decisions that TtEC made in reviewing URS's CCNs, as TtEC had previously offered to pay reduced amounts of the CCNs on which URS subsequently recovered. However, for purposes of its right of reimbursement, the vindication was not necessary. What entitled TtEC to reimbursement was the fact that these legal costs were incurred in the course of performing duties under its own Contract with the Army.

37. On May 13, 2008, the Defense Contract Audit Agency ("DCAA") of the Northeastern Region Northern New Jersey Branch Office of the Department of Defense issued a memorandum to the Contracting Officer following its review of the legal costs incurred by TtEC through FY 2006 in preparation and defense of the lawsuit filed by

URS. The purpose of the DCAA audit was "to obtain sufficient evidence to support an opinion on the allowability, allocability, and reasonableness of the costs." The examination was conducted in accordance with generally accepted government auditing standards. Based upon the examination, the DCAA "found sufficient evidence to support an opinion on the allowability, allocability, and reasonableness of the costs based upon FAR Part 31 provisions and Contract terms." The DCAA determined that TtEC accounted for the legal costs incurred in preparation and defense of the URS lawsuit under the Contract in accordance with proper accounting procedures, and the criteria for treating these expenses as a direct cost were supported by Disclosure Statement Items 3.1.0 and 3.2.3(k). With respect to URS's appeal of the court decision, the DCAA recommended that TtEC provide updated legal expense amounts to the Contracting Officer, along with estimates of future legal appeal costs. Results of the audit were discussed with the Executive Director of Government Compliance and Manager of Government Compliance on May 1, 2008, and they reportedly agreed with the findings. Notwithstanding the DCAA audit report, however, the Army has still failed and refused to pay TtEC's legal costs in preparation and defense of the URS lawsuit.

38. The total cost of URS's CCNs, had they been approved, would have been approximately $15,300,000.00, and certain tort claims filed in the suit would have added another $10,000,000 if URS had prevailed on its extra-contractual claims. At the conclusion of URS's litigation efforts, only about 5.4% of the disputed CCNs were held to be ultimately payable by the trial court, in an amount of $836,317.50 (plus interest), which was further diminished when adjusted by certain applicable credits. URS recovered only about 3% of its total claim. TtEC's diligent performance of their

contractual duties as contract administrator was vindicated in the trial proceeding. The benefit realized by the Army as a result of TtEC's refusal to approve improper CCNs, even when confronted with litigation, is immediately apparent and can be measured mathematically – approximately $14 million dollars.

39. Notwithstanding (1) the clear benefit to the Army conferred by TtEC's performance of its contractual duties by disallowance of URS's improper CCNs, (2) the Army's refusal to allow a settlement that would provide for the payment of the disputed CCNs, (3) the understanding, based on the parties' prior course of dealing and the Army's implied promises repeatedly made in correspondence, that TtEC's attorney fees would be paid at the conclusion of the URS litigation, and (4) the determination by the DCAA at the conclusion of its audit that TtEC's legal costs incurred in defense of the URS lawsuit were allowable, allocable, and reasonable, the Army has refused to pay TtEC's attorney fees incurred in the defense against URS claims. Such conduct by the Army is a direct and material breach of the parties' Contract and a claim for which TtEC is entitled to recover under the CDA.

40. On May 23, 2008, TtEC submitted notice of its intent to file a claim with the United States Court of Federal Claims to the Contracting Officer.

41. On June 4, 2008, TtEC submitted a supplemental certification of claim to the Army Contracting Officer for the recovery of additional litigation and appeal costs that had been incurred since July 2, 2007. This was a billing of its additional unpaid litigation costs and appellate costs incurred (1) pursuant to Task Order 298 through March 31, 2008, and (2) pursuant to Task Order 376 through April 30, 2008. These

additional costs incurred by TtEC over recent months and invoiced to the Army under the Contract amounted to $107,560.25. TtEC included the certification required by FAR 33.207 and 52.233-1 that the claim was made in good faith, that the supporting data was accurate and complete to the best of its knowledge, and that the amount requested accurately reflected a contract adjustment for which TtEC believed the United States was liable.

42. The amounts unpaid under the Contract and presently owed to TtEC under the above-referenced Task Orders are (1) the certified claim presented on July 2, 2007, in the amount of $2,163,953.45 and (2) the supplemental certified claim presented on June 4, 2008, in the amount of $107,560.25. The complete amount owed to TtEC at this time is $2,271,513.70. However, costs under the these Task Orders continue to be incurred, and the amount owed will continue to increase so long as TtEC's Contract claims remain unpaid by the Army.

## CLAIMS AGAINST THE UNITED STATES

### Breach of Express Contract

43. Paragraphs 1 through 42 are incorporated herein by reference.

44. A valid, enforceable Contract existed between TtEC and the United States [Army], and TtEC and the United States were in privity at all times. The claims asserted herein arise from the Contract between TtEC and the United States.

45. TtEC fully or substantially performed its contractual obligations. The claims asserted herein arise from TtEC's performance of its contractual obligations to the United States.

46. TtEC has satisfied all conditions precedent to bringing its claims according to the terms of the Contract.

47. TtEC has also satisfied all conditions precedent to bringing this action in accordance with the CDA.

48. The United States, acting by and through the Army Contracting Officer, has breached the parties' Contract. The United States has failed, without legal excuse, to fulfill its payment obligations owed to TtEC that formed part of the agreement. Specifically, the attorney fees incurred by TtEC in defense against claims asserted by URS were costs for which TtEC is entitled to payment under the Contract. The breach resulting from the failure to pay such costs was material.

49. As a natural, probable, and foreseeable consequence of the Army's failure to pay TtEC the agreed costs of performance of the Contract, *i.e.*, the costs of its attorney fees in defending against the URS lawsuit, TtEC has suffered injury.

50. TtEC sues to recover its actual damages, as well as prejudgment and postjudgment interest and costs as allowed under the CDA, which includes recovery of interest from the date the Army contracting officer received the claim until payment thereof. *See* 41 U.S.C. §611.

**Breach of Implied Contract**

51. Paragraphs 1 through 42 are incorporated herein by reference.

52. In the alternative, an implied contract to pay TtEC the attorney fees incurred in defense against URS's claims arose from the acts and conduct of the parties. The facts and circumstances establish that the parties had a mutual intention to defend against URS's claims. TtEC agreed to undertake defense of the lawsuit, and the Army agreed to make payment of TtEC's attorney fees at the conclusion of the litigation.

53. TtEC fully or substantially performed its contractual obligations. TtEC defended against the URS claims through the end of trial, to a final judgment favorable to both TtEC and the Army, and is continuing to defend the judgment through the appellate process.

54. TtEC has also satisfied all conditions precedent to bringing this action in accordance with the CDA.

55. The United States, acting by and through the Army Contracting Officer, has breached the parties' implied contract. The United States has failed, without legal excuse, to perform a promise to pay TtEC that formed part of the agreement, and the breach was material.

56. As a natural, probable, and foreseeable consequence of the Army's failure to pay TtEC the costs of its attorney fees in defending against the URS lawsuit, TtEC has suffered injury.

57. Inasmuch as the United States was the direct and primary beneficiary of TtEC's defense against URS's claims, the United States would be unjustly enriched at the expense of TtEC if it failed to pay for the attorney fees incurred in adjudicating the liability of the United States for payment of URS's disputed CCNs.

58. TtEC sues to recover its actual damages, as well as prejudgment and postjudgment interest and costs in accordance with the CDA, 41 U.S.C. §611.

**REQUESTED RELIEF**

WHEREFORE, Tetra Tech EC, Inc., Plaintiff, seeks relief in the form of payment for the services performed under an express or implied Contract with the United States, which includes the unpaid amount of $2,271,513.70 plus interest, attorneys fees, and such other and further relief, both general and special to which it may show itself justly entitled.

Respectfully submitted,

Dated: June 12, 2008

Patricia M. Rosendahl

William M. Coats
Patricia McGarvey Rosendahl
COATS, ROSE, YALE, RYMAN & LEE, P.C.
3 Greenway Plaza, Suite 2000
Houston, Texas 77046
Telephone: (713) 651-0111
Telecopier: (713) 651-0220

ATTORNEYS FOR TETRA TECH EC, INC.